FILED

JUL 2 8 2009

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ANNETJE C. NOYES,

       **Plaintiff,**

v.                              **Civil Action No. 3:08CV104**
                                   **(The Honorable Robert E. Maxwell)**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying the

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

Annetje C. Noyes ("Plaintiff") filed an application for DIB on September 12, 2002, alleging

disability since August 13, 2002, due to herniated disc and disc disease of her lower back (R. 124-27,

145). Plaintiff's applications were denied at the initial and reconsideration levels (R. 91-92).

Plaintiff requested a hearing, which Administrative Law Judge John Melanson ("ALJ") held on

December 10, 2003, *via* video between Portland, Maine, and Bangor, Maine. At this administrative

hearing, Plaintiff, represented by David Chase, and Cynthia Flint-Ferguson, a vocational expert

("VE"), testified (R. 36-72). Subsequent to the December 10, 2003, administrative hearing, the ALJ

conducted a second administrative hearing on March 25, 2004, in Portland, Maine. Plaintiff, who was represented by Ben Oberman, testified (R. 73-90). On September 30, 2004, the ALJ entered a decision finding Plaintiff was not disabled (R.23-32). On October 25, 2004, Plaintiff filed a request for review with the Appeals Council (R. 21-22). On April 26, 2005, the Appeals Council denied Plaintiff's request for review of the ALJ's decision of her September, 2002, application, making the ALJ's decision the final decision of the Commissioner (R. 4-6).

During the pendency of the review request to the Appeals Council of the ALJ's September, 30, 2004, decision, Plaintiff filed a new application for DIB on December 21, 2004, which was granted by the state agency on March 2, 2005; Plaintiff was found disabled as of October 1, 2004, the day after the ALJ's written denial in the instant case (R. 294).

After the Appeals Council issued its April 26, 2005, decision, Plaintiff appealed the ALJ's September 30, 2004, denial of benefits to the United States District Court for the District of Maine; Plaintiff's appeal was granted and the case was remanded to the Commissioner on December 20, 2005 (R. 303).

On May 24, 2006, the ALJ conducted a hearing in Bangor, Maine, as per the remand order of the District Court of Maine and the resulting mandate by the Appeals Council (R. 461-92). On June 20, 2006, the ALJ issued a decision, finding Plaintiff was not disabled through the date of the decision and reversed the March 2, 2005, decision of the state agency wherein Plaintiff was found disabled as of October 1, 2004 (R. 292-302).

Plaintiff filed written exceptions to the ALJ's June 20, 2006, decision with the Appeals Council (R. 288). On March 27, 2008, the Appeals Council decided that for the period prior to October 1, 2004, Plaintiff was not under any disability but, for the period beginning October 1, 2004,

she was (R. 282-84). The March 27, 2008, decision of the Appeals Council was the final decision

of the Commissioner after remand, which, on May 19, 2008, Plaintiff appealed to the United States

District Court for the District of Maine; said appeal was transferred to the United States District

Court for the Northern District of West Virginia when Plaintiff relocated to this district.

## II. STATEMENT OF FACTS[1]

Plaintiff was born on December 30, 1943. According to her calculations, she was sixty-six

years old when she filed her motion for summary judgment with this Court (Plaintiff's brief at p. 2).

Plaintiff's past relevant work included dental assistant and dental office manager (R. 156-63, 146).

On February 14, 2002, Plaintiff was treated by Dr. Nabozny for a history of bipolar disease,

GERD, hypertension, reactive airway disease, and osteoarthritis. Plaintiff medicated with Effexor,

Neurontin, Trazadone, Famotidie, Monopril, Nasonex, Serevent, Flovent, and Vioxx. Plaintiff

---

[1]Plaintiff's statement of fact is not in conformance with LR Gen P. 86.02(g), which
mandates the following: "Claims or contentions by the plaintiff alleging deficiencies in the
Administrative Law Judge's (ALJ) consideration of claims or alleging mistaken conclusions of
fact or law and contentions . . . **must include a specific reference, by page number, to the
portion of the record** that (1) recites the ALJ's consideration or conclusion and (2) supports the
party's claims, contentions or arguments. In her brief, Plaintiff refers to page 446 of the record
as a "complete summary of the medical records prepared by the State Agency" to support her
claim that Plaintiff's "disability is degenerative disc disease" (Plaintiff's brief at p. 2). That
summary, on page 446 of the record, is a listing of treatments and diagnoses Plaintiff received
that were considered by a state agency physician in his completion of a Physical Residual
Functional Capacity Assessment of Plaintiff. It is not a reference to the medical tests and
treatments of Plaintiff or office notes and opinions made by those physicians who treated
Plaintiff for her alleged condition. Additionally, even though there is no specific local rule
relative to social security appeal cases that require that Plaintiff support her allegations as to the
errors made by the ALJ by referring to or citing case law, regulations, or rules that govern social
security cases in this circuit, Plaintiff did not provide one authority for either of her arguments.
Such citations are a pertinent part of any brief offered to the court. Plaintiff's counsel is
admonished for her non-compliance with LR Gen P 86.02(g) and her failure to support her
claims as to the errors she assigns to the ALJ with legal citations and is instructed to so comply in
any future filings.

reported she experienced pain in her right inguinal regional, right sided thoracic back, and right buttocks. Plaintiff reported her former rheumatologist told her that she would need spinal surgery. Dr. Nabozny referred Plaintiff to Dr. Long for an evaluation of her thoracic spine (R. 200, 420).

On May 8, 2002, Plaintiff reported to Dr. Nabozny that Dr. Weymouth, the chiropractor, was "helping her" thoracic neuritis symptoms. Dr. Nabozny recommended Plaintiff continue treating with Dr. Weymouth. He found there was "no indication for neurosurgery" for her back (R. 199, 418).

On June 19, 2002, Plaintiff was treated by Dr. Nabozny for hypertension, thoracic neuritis, lumbar back pain, bipolar illness, RAD, and alcohol use. Plaintiff reported she continued to be treated by Dr. Weymouth, which improved her sciatic pain. Plaintiff had no lower extremity weakness; her distal pulses were good; there was decreased sensation in both feet. Dr. Nabozny recommended Plaintiff continue care with the chiropractor (R. 198, 417).

Plaintiff's July 9, 2002, MRI of her lumbar spine showed "loss of intervertebral disc signal at multiple levels with some mild loss of height at the L3-4 level"; "multiple subligamentous disc bulges . . . with no focal disc herniation"; no abnormal bone signal, "no abnormality of the conus or filum terminale"; and "no frank transligamentous disc herniation or evidence of any spinal stenosis or neural foraminal or lateral recess stenosis" (R. 207 414-15).

On August 1, 2002, Plaintiff reported to Dr. Nabozny she experienced right-side sciatic pain and both feet were numb. Dr. Nabozny noted that, except for a bulging disc and some height loss at the L3-4, her July 9, 2002, lumbar MRI was unremarkable. Dr. Nabozny noted Plaintiff was being treated with Neurontin and Trazadone, which made it "hard to know what to add at this point" to treat her pain. Plaintiff reported she had "Percocet 5's at home"; Dr. Nabozny instructed her to medicate with that drug (R. 196, 413).

On August 13, 2002, Plaintiff was examined by Dr. Crowley. She complained of back pain that had existed for several months. Plaintiff's vital signs were stable; her straight-leg raising test was positive, "but not until about 80 or 90 degrees." Plaintiff's deep tendon reflexes and strength were normal. She had decreased sensation at the "S1 on the right foot." Dr. Crowley prescribed Percocet and referred her to Dr. Just for an injection. Plaintiff reported that injections did not effectively treat her pain (R. 195, 410).

On August 13, 2002, an x-ray was made of Plaintiff's lumbar spine. It showed "degenerative end plate changes at L3-4 and facet joint changes at L4-5 and L5-S1. Nothing acute." There were "[s]omewhat more impressive degenerative end plate changes . . . at T10-11 through T12-L1." There was no spondylolisthesis or spondylolysis. The x-ray was "negative" (R. 204, 411).

On August 15, 2002, Dr. Just corresponded with Dr. Crowley about Plaintiff's pain. Dr. Just reported that Plaintiff had begun treating with a chiropractor in the spring of 2002. Plaintiff reported that in June, 2002, the chiropractor had "attempted to adjust her hip, which seem[ed] to have led to her current problem of right leg sciatica." Dr. Just wrote that Plaintiff's July MRI showed "degenerative disc disease at multiple levels of her lumbar spine and a slightly right-sided bulging of the L5 S1 disc." Dr. Just noted Plaintiff had received "conservative care," but that her pain had "become progressively worse overtime." Dr. Just wrote Plaintiff's pain was constant, worse when she walked, and improved a "small degree" with rest. Plaintiff experienced numbness in her right leg to the lateral aspect of her foot. Plaintiff did not experience weakness in her right leg, but Dr. Just noted that her "right leg [would] 'give out' occasionally" (R. 249, 251, 383).

Dr. Just wrote that Plaintiff was, during his examination of her, "highly symptomatic and almost any movement appeared to provoke pain" mainly in her low back and hip with radiation to

her calf. Plaintiff experienced "increase[d] pain when attempting lumbar range of motion maneuvers in all directions" (R. 249, 384). Plaintiff stated she experienced pain when she "attempted to sit on the examining table and when she attempted to lie down on the examination table" (R. 249-50). Dr. Just noted Plaintiff had "no straight leg raising pain in the seated position at 90 degrees on either side and her hip examination was unremarkable." Plaintiff's strength was normal; she could walk "a few small steps" on her toes and heels; her knee reflexes were normal; she had "trace positive reflex in her left ankle." Plaintiff had "no reflex . . . at all" in her right ankle (R. 250, 384).

Dr. Just's impression was for "right leg sciatica of unclear etiology." Dr. Just noted Plaintiff's "physical examination [was] not terribly convincing for a herniated disc syndrome." Dr. Just also noted that Plaintiff's "radiation pattern of her pain, which include[d] the distal aspect of her leg, and the numbness that she describe[d] are [sic] not consistent with lumbar joint pain." He opined he was, at that point, not "confident of her diagnosis." Dr. Just recommended Plaintiff undergo a "quantitative sensory test to look for objective evidence of sensory nerve dysfunction" and a "fluoroscopically targeted hydrocortisone injection . . . to bathe both the L5 and S1 nerve roots" (R. 250, 252, 384-85).

On August 19, 2002, Plaintiff received a lumbar spine Depro-Medrol injection (R. 247).

On August 28, 2002, Dr. Just examined Plaintiff and found she had a "right ankle jerk reflex" that she did not have during his examination of her the preceding week. Plaintiff had no straight leg raising pain, but she was "very symptomatic on range of motion testing about the waist." Based on Plaintiff's range of motion testing, Dr. Just found Plaintiff's "problem [was] a facet problem" (R. 248). Dr. Just injected Plaintiff's lumbar spine at L3-4, L4-5, and L5-S1 with Marcaine, epinephrine, and dexamethasone (R. 246).

On September 4, 2002, Dr. Just noted that Plaintiff had undergone "facet joint injections" the previous week, which had "not helped." Plaintiff complained of "persisting right-sided mechanical low back pain." Dr. Just recommended she receive a "sacroiliac joint injection." Dr. Just opined that, if that injection did "not prove helpful," he would order a SPECT scan. Dr. Just further opined that if the SPECT scan was negative, he would "have nothing further to offer her" (R. 244).

On September 9, 2002, Plaintiff was injected with Depo-Medrol by Dr. Just (R. 243).

On September 19, 2002, Dr. Just ordered a bone SPECT image of Plaintiff's lumbosacral spine area, hips and pelvis. "No abnormal activity [was] seen in the hips and pelvis." There was "significant activity in the facets at L5-S1, greater on the left than on the right" (R. 242).

On September 23, 2002, Dr. Just injected Plaintiff with Depro-Medrol (R. 241).

On October 7, 2002, Plaintiff reported to Dr. Just she was "feel[ing] somewhat better" after her September 23, 2002, injection. Dr. Just provided Plaintiff with a facet joint injection of hydrocortisone (R. 378).

On October 16, 2002, Dr. Just injected Plaintiff's lumbar facet joints at L3-L4, L4-L5, and L5-S1, bilaterally, with Marcaine, epinephrine and Depo-Medrol (R. 376).

On October 21, 2002, a state-agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 214). Plaintiff could never climb ropes, ladders, or scaffolds. Plaintiff could frequently balance, kneel, and crawl; she could occasionally stoop and crouch (R. 215). Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. 216-17). The state-agency physician noted

Plaintiff had low back pain, but she was "able to cook, shop, drive, visit and carry out social functions" (R. 218).

Also on October 21, 2002, a state-agency physician completed a Psychiatric Review Technique of Plaintiff. She had no medically determinable impairment or limitations (R. 221, 231).

In an October 30, 2002, letter to Dr. Crowley, Dr. Just wrote that he had been treating Plaintiff "fairly intensively since August," 2002. Dr. Just noted Plaintiff's "diagnostic workup . . . revealed a predominantly right-sided bulging of the L5-S1 disc, and a SPECT imaged nuclear medicine scan revealed facet activity at several levels." Based on these test results and his examinations of Plaintiff, he had treated her with injections of hydrocortisone for facet pain. Dr. Just noted Plaintiff was "more comfortable now at rest," but her "activity tolerance [was] still extremely poor." Dr. Just noted Plaintiff had attempted to do "light work in her garden," but "experienced severe worsening of symptoms." Dr. Just's examination of Plaintiff revealed she was neurologically intact and "essential[ly]" unchanged. Dr. Just wrote his diagnosis was for lumbar facet syndrome "with persisting limitation in activity tolerance with some improvement in rest." Dr. Just wrote he had given her as many cortisone injections as [he] dare[d] . . ." (R. 375).

On January 2, 2003, Plaintiff was evaluated by Dr. Just for severe low back pain and right leg pain. Plaintiff described her pain as continuous, but worse in the morning. Plaintiff stated her pain caused her to wake from sleep when she moved. Plaintiff stated her pain "seem[ed] to originate in the arc of the hip posteriorly and . . . radiate[d] down the right leg to the level of the calf." Plaintiff expressed she had pain and numbness in her toes (R. 238). Plaintiff informed Dr. Just that she medicated with Neurontin, Effexor, Vioxx, Imodium, Allegra, Duragesic patch, and hypertension medication (R. 238). Dr. Just's examination of Plaintiff revealed no straight leg raising pain while

8

seated, normal knee reflexes, normal left ankle reflex, no right ankle reflex, and normal strength. Dr. Just noted Plaintiff had been treated "conservatively" with hydrocortisone injections, which resulted in her experiencing a two-week period of pain relief. Dr. Just recommended Plaintiff be treated with a radiofrequency lumbar facet neurotomy (R 239).

On January 3, 2003, Dr. Just performed a "radiofrequency lumbar facet neurotomy at L3, L4, L5, L5-S1 and S1 bilaterally" on Plaintiff (R. 235).

On February 24, 2003, Lewis F. Lester, Ph.D., a state-agency physician, completed a Psychiatric Review Technique of Plaintiff. Dr. Lester found Plaintiff had no medically determinable impairment, but had a co-existing non-mental impairment that required referral (R. 256). Specifically, Dr. Lester found Plaintiff had back pain. He found Plaintiff had "no mental health allegation and ADL's [were] functional" (R. 266). Dr. Lester found there was "no evidence . . . from a medical source" that Plaintiff had been "evaluated and treated" for "'bipolar disease'" "for sure" (R. 269). Dr. Lester found the "records [did] not show a significant mental health problem." Dr. Lester also noted Plaintiff prepared her meals, shopped, managed money, paid bills, drove, watched television, read, sewed, cared for her dogs, visited with others, "[went] out socially," and went to daily AA meetings (R. 268). Dr. Lester found no functional limitations (R. 266).

In a letter to Dr. Crowley on March 4, 2003, Dr. Just wrote that he had reduced the strength of Plaintiff's Duragesic patch from 100mg to 75mg . Dr. Just informed Dr. Crowley that he also prescribed Tylox. Dr. Just informed Dr. Crowley that Plaintiff "continue[d] to experience pain on a daily basis, but [was] functioning at an acceptable, although minimal, level" (R. 371).

On March 13, 2003, Iver C. Nielson, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Nielson found Plaintiff could

occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 271). Dr. Nielson found Plaintiff could occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; and could occasionally balance, stoop, kneel, crouch, and crawl (R. 272). Dr. Nielson found Plaintiff had no manipulative, visual, or communicative limitations (R. 273-74). Dr. Nielson found Plaintiff should avoid concentrated exposure to hazards, but had no limitations regarding her exposure to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation (R. 274). Dr. Nielson noted Plaintiff's "pain [was] an issue – exam is fairly benign" (R. 275).

On May 20, 2003, Dr. Just informed to Dr. Crowley that Plaintiff was medicating with Duragesic and Tylox. Dr. Just wrote that he had treated Plaintiff aggressively, but did not "feel that [he] [had] made any headway at all" in treating her pain (R. 370).

On July 22, 2003, Dr. Just wrote that he had started caring for Plaintiff during the previous summer for right-sided low back pain and right leg sciatica. He noted that the quantitative sensory test that was administered at that time "suggested a right L4 and possible S-1 radicular pain problem, which led to fluoroscopically targeted injections on most respected nerve roots." Dr. Just noted that Plaintiff's back pain persisted, so he treated her for synovial joint pain with injections. Dr. Just wrote that he had performed a radiofrequency lumbar facet neurotomy in January, 2003; Plaintiff informed him that she "believe[d] that this procedure did help the back pain, but the right leg sciatica persisted unabated." Dr. Just decided there was no "need to repeat the MRI."; Plaintiff was pleasant and comfortable at rest. He diagnosed persistent right leg sciatica. Dr. Just opined that he had realized "success in treating sciatica with epidural steroid injections" (R. 369). Dr. Just administered

a caudal epidural steroid injection to Plaintiff (R. 368).

On August 1, 2003, Dr. Just gave Plaintiff a caudal epidural steroid injection (R. 367).

On December 5, 2003, Dr. Nabozny wrote a letter to Plaintiff's lawyers in Maine. He noted Plaintiff had been treated at the clinic where he practiced since February, 2002, for chronic back pain. Dr. Nabozny noted Plaintiff's pain was "quite severe and has been disabling to her." Dr. Nabozny wrote Plaintiff had been recently treated for her pain with a "100 microgram duragesic patch" and Percocet, of which she took three per day. Dr. Nabozny noted the radiofrequency lumbar facet neurotomy and epidural steroid injects administered by Dr. Just had provided Plaintiff "minimal relief." Dr. Nabozny wrote that it was Dr. Just's September 12, 2002, opinion that "he had nothing more to offer . . . [Plaintiff] as far as treatment." Dr. Nabozny opined that the benefits of the narcotic pain medications that Plaintiff took to treat her condition were "pain relief and ability to function" and that these benefits "minimally outweigh[ed] the risks which [were] constipation, drug dependency, lethargy, etc." Dr. Nabozny wrote that Plaintiff had been exercising at "Curves for several months and doing quite well there" but had to "go to bed" and remain there for the remainder of the day when she returned home from exercising. Dr. Nabozny opined it was "beneficial for [Plaintiff] to continue and try to exercise regularly." Dr. Nabozny finally opined that Plaintiff had received "extensive evaluation and treatment" for her complaints of back and right leg pain and had realized no improvement from her symptoms; therefore, he noted it was his "belief at this time that she is disabled" (R. 278)[2].

On December 22, 2003, Plaintiff was examined by Dr. Nabozny, who noted Plaintiff's neck

---

[2]This document was received by the ALJ at the December 10, 2003, administrative hearing (See p. 3, List of Exhibits; R. 39).

had no adenopathy and diagnosed chronic pain. He prescribed Percocet for treatment (R. 406).

On January 5, 2004, Dr. Nabozny noted he had not treated Plaintiff for "almost a year" and that she had "chronic thoracic lumbar back pain," for which she received treatment from Dr. Just. Dr. Nabozny wrote that Plaintiff had a "bulging disk at L5-S1 on the right and also . . . some facet activity on a SPECT nuclear scan." Plaintiff was medicating with a Duragesic patch and Percocet. Plaintiff reported a history of bipolar disease and stated she "[felt] [it] ha[d] been quite stable on her current medications." Upon examination, Plaintiff's extremities showed no edema or rashes and her distal pulses were "good." Dr. Nabozny diagnosed bipolar disease, stable, chronic lumbar and thoracic back pain, and osteoarthritis (R. 400).

On June 2, 2004, Dr. Nabozny treated Plaintiff for RAD, bipolar disease, osteoarthritis, chronic pain and GERD. Plaintiff stated she felt Percocet was not effective in treating her pain. Dr. Nabozny prescribed a Duragesic patch for treatment of her chronic pain (R. 395).

On July 1, 2004, Plaintiff reported to Dr. Nabozny that her "back pain [was] acting up." Plaintiff reported Metadone "made her just very lethargic and unsteady and seemed too strong." She requested a prescription for Percocet. Plaintiff reported she continued to exercise at Curves. Plaintiff's straight leg raising test was negative bilaterally. Dr. Nabozny diagnosed chronic low back pain and right leg sciatica. Dr. Nabozny prescribed Oxycodone (R. 392).

On November 4, 2004, Dr. Nabozny noted Plaintiff had a "sort of a right sided sciatica." Dr. Nabozny's examination of Plaintiff revealed a negative straight leg raising test. Dr. Nabozny diagnosed osteoarthritis and degenerative disc disease with chronic lumbar back pain. Dr. Nabozny continued Plaintiff's prescriptions for Duragesic patch and Oxycodone and instructed her to increase her intake of Neurontin (R. 389).

On January 5, 2005, Dr. Nabozny corresponded with Staci Gustin of the Department of Human Services of the State of Maine and informed Ms. Gustin that Plaintiff had been a patient for "almost three years." He wrote Plaintiff had "degenerative disc disease at multiple levels on her lumbar spine and has severe chronic pain because of" it. Dr. Nabozny opined that Plaintiff's abilities to sit, stand, or walk for long periods or to lift or bend were "severely" limited. Dr. Nabozny wrote that Plaintiff was "clearly . . . disabled due to her degenerative disc disease" (R. 388).

On January 12, 2005, Kenneth Kindya, Ph.D., completed a clinical interview, "mini-mental status exam" and a M-FAST examination of Plaintiff upon referral from the Social Security Disability Administration. Plaintiff stated she was disabled due to bipolar disorder, herniated disc at L5 and "back problems" (R. 421). Dr. Kindya found Plaintiff scored a 28 out of 30 on this Mini-Mental Status Exam, which "place[d] her above the cut off for cognitive impairment." Dr. Kindya made the following diagnoses: Axis I – bipolar disorder; Axis II – deferred; Axis III – back problems and chronic bronchitis; Axis IV – poverty and unemployment; Axis V – GAF 55. Dr. Kindya found Plaintiff could manage her funds if she did not abuse substances (R. 423).

On February 22, 2005, David Houston, Ph.D., completed a Psychiatric Review Technique of Plaintiff. He found she had impairments that were not severe; Dr. Houston found Plaintiff had bipolar syndrome, an affective disorder (R. 425, 428). Dr. Houston found Plaintiff had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace (R. 435)

On February 28, 2005, Dr. Donald Trumbull, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry ten pounds; could frequently lift and/or carry less than ten pounds; could stand and/or

walk for a total of at least two hours in an eight-hour workday; could sit for a total of about six hours in an eight-hour workday and must periodically alternate sitting and standing to relieve pain or discomfort; and could push/pull unlimited (R. 440). Dr. Trumbull found Plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 441). Dr. Trumbull found Plaintiff had no manipulative, visual or communicative limitations (R. 442-43). Dr. Trumbull found Plaintiff's environmental limitations were unlimited to extreme heat, noise, and vibration; he found Plaintiff should avoid concentrated exposure to extreme cold, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 443). Dr. Trumbull based his findings on Plaintiff's "EDCS" in which Plaintiff asserted that she had "trouble standing . . . and bending"; her pain was constant; she "could not sit in the position required for a dental assistant"; her pain was acute; she could not walk long distances; she attended physical therapy three times weekly; her memory had worsened (R. 444). Dr. Trumbull also considered Dr. Nabozny's November 4, 2004, opinion that Plaintiff's pain "severely limit[ed] sit/stand and ability to walk very far" (R. 445). In addition to the above medical records, Dr. Trumbull reviewed Plaintiff's July 9, 2002, MRI; reports of Dr. Just; Dr. Kindya's opinions and findings; and additional notes and diagnoses of Dr. Nabozny (R. 446).

Appeals Council's Ruling on September 30, 2004 Decision by ALJ

On January 10, 2006, the Appeals Council remanded this case to an administrative law judge. In its remand order, the Appeals Council noted that District Court of Maine had vacated the ALJ's September 30, 2004, decision and remanded it to the Commissioner. The Appeals Council noted that Plaintiff was found disabled as of October 1, 2004, on a subsequent application she had filed. The case was remanded "for the period prior to October 1, 2004, . . . for further proceedings

consistent with the order of the court." The Appeals Council instructed the ALJ to "comply with the court order [of the District Court of Maine] and take the actions set forth therein" and "consider the additional evidence submitted with the subsequent claim." The Appeals Council wrote that the ALJ "may wish to obtain the testimony of a medical expert to address the issue of onset of disability prior to October 1, 2004" (R. 318).

As to the court order issued by the District Court of Maine and with which the ALJ was ordered by the Appeals Council to comply, the United States Magistrate Judge for the District Court of Maine found that the ALJ's had misread portions of Exhibits 2E and 3E (R. 307).

In Exhibit 2E, Plaintiff listed the years she worked, the relevant work she performed, and her duties performed at those jobs (R. 146). Exhibit 3E contained the following information about Plaintiff's work history: 1) dental assistant from July, 2001, to December, 2001; 2) dental assistant/front desk support from September, 2001, to December, 2001; 3) dental assistant/front desk support from August, 1998, to January, 2001; 4) dental assistant from March, 1988, to September, 1994; and 5) office manager from September, 1994, to March, 1997 (R. 156).

Relative to Plaintiff's job as dental assistant from July, 2001, to December, 2001, she wrote she was a "dental assistant/front desk support" and described her duties as follows: used machines, tools and equipment; used technical knowledge or skills; wrote reports; completed reports; walked; stood; sat; stooped; knelt; crouched; handled; grabbed; grasped large objects; typed; handled small objects; filled in charts; lifted ten pounds at the heaviest; frequently lifted less than ten pounds. She noted that she had worked in this dental office as a dental assistant from July, 2001, to September, 2001; then she became the "front desk support" through December, 2001 (R. 157). Plaintiff described her second job as that of a front desk support person, and she performed this job as she did

the first job she listed (R. 158). Plaintiff's third job as dental assistant/front desk support was described as her being the "only assistant and front desk support" person in the dental office. She "assisted the Dr., did all the clean up & sterilization, answered phone, and other front desk functions including all filing." Plaintiff used machines, tools, equipment, technical knowledge, skills. She wrote and completed reports. She walked, stood, sat, stooped, knelt, crouched, handled, grabbed, grasped large objects, typed, and handled small objects. She lifted ten pounds, at the most, and she frequently lifted less than ten pounds (R. 159).

Relative to Plaintiff's fourth listed job, she named her title as dental assistant and wrote that she performed the job as she performed the job in descriptions two and three above (R. 160). There was an addendum to this entry. Plaintiff wrote that she had worked as a dental assistant during the first six years and then as office manager the last three years. As office manager, she oversaw personnel "and in-house related tasks" (R. 163). Plaintiff's job five – that of office manager from September, 1994, to March, 1997 – required her to oversee the "dental assistants and front desk personel" [sic]. She "handled customer support, in-house support and annual hiring and performance reviews"; was responsible for all ordering and maintaining of office supplies; moved boxes, carried, lifted and reached; walked for four hours and sat for four hours; wrote, typed, handled small objects, lifted ten pounds and frequently lifted less than ten pounds; supervised fourteen people, made salary recommendations and developed office procedures and policies; filled in as a dental assistant "if short staffed" and filled in as a front desk support worker "if short staffed" (R. 161, 163).

The United States Magistrate Judge for the District of Maine noted the ALJ, in his September 30, 2004, decision, was in error when the ALJ found that the "claimant reported on two separate occasions that she worked solely as a Dental Office Manager from September, 1994 through March

16

1998. (Exhibits 2E, 3E). The claimant described the position of office manager '. . . overseeing personnel and in-house [sic] related tasks' (Exhibit 3E). The claimant did not report that she performed the duties of a dental assistant, which contradicts her testimony, wherein she stated she performed the duties of a dental assistant as needed. . . ." (R. 307). The United States Magistrate Judge for the District of Maine found that Exhibit 3E clearly read that Plaintiff, "while working as an office manager at the 'same dental office' from September 1994 through March 1997, *id*. at 156 ("Job No. 5"), . . . was 'responsible for all ordering and maintaining of office supplies,' 'had to move boxes, carry, lift and reach to organize in [sic] office supplies,' and 'also filled in as a dental assistant or at the front desk if short staffed,' *id*. at 161, 163. The plaintiff clearly did report that she performed the duties of a dental assistant during this period and the written report is not at all inconsistent with her testimony at the hearing." The United States Magistrate Judge for the District of Maine also found that the "same report is made in Exhibit 2E, where the Plaintiff reported that she worked as a 'dental assistant/office manager' from 1987 through 1998. *Id*. at 154. The vocational expert actually testified that the job as the Plaintiff described it was inconsistent with the DOT. *Id*. at 55. As the administrative law judge himself noted . . ., if plaintiff's description of her job were accurate, evaluation of her past relevant work based on the less physically demanding of the two jobs would be inconsistent with the Social Security Act . . . . The administrative law judge's conclusion that the plaintiff's description of her job in her testimony was not accurate because it was inconsistent with her written reports is based on an error in reading those reports" (R. 307-08).

Administrative Hearing (Third)

On May 24, 2006, Administrative Law Judge Melanson conducted a third administrative hearing. The ALJ noted that the hearing was being conducted to comply with the district court's

remand order to address the "issue . . . with the vocational evidence of record." The ALJ noted the district court did not "find fault with the RFC that" he had "determined" in the earlier decision but that he was to "get new or develop new vocational evidence" (R. 463). Plaintiff's counsel stated that the case was remanded because the ALJ had noted that Plaintiff's "testimony regarding her job duties was inconsistent with what she had put in her two exhibits," but that Plaintiff had written her job duties in "the continuation space on those exhibits, and in fact, her testimony was entirely consistent with what she had put in those exhibits, that is that the duties of office manager and dental assistant were combined, and that's how she performed them when she worked" (R. 464). The ALJ called VE Peter Misaro and questioned him as to Plaintiff's past relevant work (R. 467-89).[3]

Plaintiff's Offer of Proof

In her Offer of Proof, which was provided to the ALJ by Plaintiff after the May 24, 2006, administrative hearing, Plaintiff recounted her previous testimony relative to her duties as "dental assistant and office manager," which, according to the Plaintiff, "were linked in numerous ways" and were as follows: she was "in charge of all of the supplies" for seven dentists; she picked up and put away those supplies; she lifted boxes; she handed supplies to the dentists (R. 363).

Plaintiff wrote, in her Offer of Proof, that she had "already testified about the amount of lifting and carrying she had to do with supplies" and that she had indicated, on her Work History From, that the heaviest weight she had to lift was fifty pounds (R. 363). Plaintiff asserted she would testify that her RFC was less than light because it was "affected by some postural limitations, the need for naps during the day, and offer medical evidence in support of this testimony" (R. 364).

_____

[3]The questions by the ALJ to the VE and the VE's responses thereto; Plaintiff's attorney's questions to the VE and the responses thereto; and the dialogue between the ALJ and Plaintiff's attorney are recounted in Contention D below.

# III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Melanson made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2006 (R. 297);

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 404.1571 *et seq* (R. 297);

3. The claimant has the following severe impairment: disorder of the back (20 CFR 404.1520(c)) (R. 297);

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526) (R. 298);

5. The claimant retains the ability for light exertional work. She cannot climb and must avoid uneven surfaces and can occasionally balance, stoop, kneel, crouch or crawl (Exhibit 8F) (R. 298);

6. The claimant is capable of performing past relevant work as a <u>dental assistant</u> (DOT 079.361-018, light exertion work, SVP 6, occasional stooping required) and <u>dental office manager</u> (DOT 169.167-034, sedentary exertion work, SVP7)(Court transcript p. 61). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565) (R. 300);

7. The claimant has not been under a "disability," as defined in the Social Security Act, from through the date of this decision (20 CFR 404.1520(f)) (R. 302).

<u>Appeals Council's Ruling on June 20, 2006, Decision by ALJ</u>

On March 27, 2008, the Appeals Council issued a decision. It reviewed Plaintiff's July 26, 2006, written exceptions to the ALJ's decision. The Appeals Council noted it informed Plaintiff that it assumed jurisdiction of this case on January 23, 2008, pursuant to 20 C.F.R. §404.984(b)(3). The

Appeals Council found the following:

1. The claimant has not engaged in substantial gainful activity since October 1, 2004 (R. 283).

2. The claimant has the following severe impairments: back disorder and mood disorder, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P. Regulations No. 4 (R. 283).

3. For the period prior to October 1, 2004, the claimant's testimony is not fully credible with regard to the severity of her impairments and symptoms and their effect on her functional abilities. For the period beginning October 1, 2004, the claimant's subjective complaints are credible and supported by the evidence of record (R. 283).

4. For the period prior to October 1, 2004, the claimant had the residual functional capacity to perform light work. Pursuant to vocational expert testimony, the claimant retained transferable skills from her combined position of dental office manager/dental assistant to the sedentary job of dental office manager and the light job of dental assistant (R. 284).

5. For the period beginning October 1, 2004, the claimant was unable to perform any jobs that exist in significant numbers in the national economy, and was disabled within the framework of Rule 201.06 (R. 284).

6. The claimant has been under a "disability," as defined in Social Security Act, since October 1, 2004 (R. 284).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court

disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.    The ALJ erred by not weighing any medical evidence prior to the favorable decision of October 1, 2004.

2.    The ALJ erred by not following the remand order to allow the claimant to testify.

The Commissioner contends:

1.    The ALJ considered all of the relevant medical evidence and correctly assessed Plaintiff's residual functional capacity.

2.    The ALJ complied with the Court and Appeals Council remand orders.

## C. Evidence

Plaintiff contends the ALJ erred by not weighing any medical evidence prior to the favorable decision of October 1, 2004. Defendant contends the ALJ considered all relevant medical evidence.

20 C.F.R. § 404.1545(a)(3) mandates what evidence is used in formulating a person's RFC. It reads as follows:

> *Evidence we use to assess your residual functional capacity.* We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity. (*See* § 404.1512(c).) However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources. (*See* §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (*See* § 404.1513.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons. (*See* paragraph (e) of this section and §404.1529.)

The ALJ considered the pre-October 1, 2004, evidence of record that was relevant to the Plaintiff's claim prior to October 1, 2004, the date the Appeals Council found Plaintiff disabled. In his June 20, 2006, decision, the ALJ considered the opinions and diagnoses of doctors, results of medical testing, and Plaintiff's activities of daily living and testimony.

The ALJ evaluated and weighed the evidence provided by Dr. Nabozny. He noted Plaintiff had been treated by him from May, 2002, to August, 2002 (R. 297). He rejected the opinions of Dr. Nabozny as to "the degree of restriction suffered by the claimant in light of the claimant's activities of daily living, the positive effect of pain medication, Dr. Nabozny's earlier clinical findings, . . ., and the findings of the DDS examiners." The ALJ noted Plaintiff was examined by Dr. Nabozny only four times in 2002 – May, June, July and August and that the July 9, 2002, MRI that Dr. Nabozny reviewed was, according to Dr. Nabozny, "'pretty unremarkable'" (R. 300). Although Plaintiff did return to the care of Dr. Nabozny in 2004, her treatment by him was "sporadic," according to the

ALJ, in that she was examined by him four times in a ten-month period (R. 299). The ALJ noted that Plaintiff's "care was assigned to Peter Just, M.D., another physician in the clinic" where Dr. Nabozny practiced The ALJ evaluated the opinions of Dr. Nabozny by writing the following: "Dr. Nabozny's opinion consists of no more than a wholly conclusory opinion unsupported by any objective medical findings, timely personal observations or test reports, and was directly contradicted by his earlier conclusions . . . and of Peter Just, M.D., the treating physician[s] whose opinion . . . that her physical examination [was] not terribly convincing for a herniated disc syndrome" (R. 300).

The ALJ also evaluated the evidence prior to October 1, 2004, submitted by Dr. Crowley. Dr. Crowley noted Plaintiff's July, 2002, MRI showed "some disc degeneration and bulging, but no frank herniation." Dr. Crowley found Plaintiff was "able to perform straight-leg raising to 80 or 90 degrees before experiencing pain and spasm." The ALJ noted Dr. Crowley found Plaintiff had normal deep-tendon reflexes and strength but that she had decreased S-1 sensation of her right foot. Dr. Crowley opined Plaintiff's "x-rays looked 'okay,'" and he recommended steroid injections and physical therapy if those injections failed (R. 297).

The ALJ did consider the opinions and diagnoses of and treatment by Dr. Just, who began treating Plaintiff in 2002. The ALJ noted Dr. Just "performed a series of epidural steroid injections based on a diagnosis of chronic mechanical low back pain with lumbar facet syndrome." The ALJ considered that Dr. Just's two examinations of Plaintiff in August, 2002, produced "unremarkable" results (R. 297). The ALJ also noted that Dr. Just performed a radiofrequency lumbar facet neurotomy on January 3, 2003, and steroid injections, on August 28, 2002, September 4, 2002, September 9, 2002, September 23, 2002, January 3, 2003, July 22, 2003, and August, 11, 2003 (R. 297-98, 299). The ALJ considered that Dr. Just based his finding that Plaintiff's condition was not

"terribly convincing for a herniated disc syndrome . . . on objective medical findings and the claimant's functional activities of daily living."  The ALJ also considered that Dr. Just "rejected the claimant's report of her symptoms which, if considered alone would 'clearly [establish] sciatica', [sic] where the claimant's right ankle reflex deficit was 'a common and unreliable deficit' (R. 300).

In conjunction with the ALJ's consideration and evaluation of the record of medical treatment provided by Drs. Nabozny, Crowley, and Just prior to October, 2004, he also noted that the "record of treatment after January 3, 2003, establish[ed] the claimant failed to seek treatment with her primary care physician for approximately eleven months in 2003" and "[h]er subsequent examinations were on a sporadic basis, occurring once in six month following the January, 2004 examination, followed by two visits in two months, and one visit four months later" (R. 299).

As noted above, the ALJ considered radiological studies: a MRI of Plaintiff's low back "showed only relatively mild degenerative changes" and was considered by Dr. Just on August 23, 2002 (R. 248, 298); a "quantitative sensory test (that) . . . suggested a right L4 and possibly an S-1 radicular pain problem" and was considered by Dr. Just on July 22, 2003 (R. 369, 298); and the July 9, 2002, MRI, that showed disc bulges, but no abnormal bone signal, no "abnormality of the conus or filum terminale," no "frank transligamentous disc herniation or evidence of any spinal stenosis or neural foraminal or lateral recess stenosis" (R. 207, 298).  The ALJ found these "unremarkable radiological studies of record [did] not support the degree of pain and restriction of function alleged by the claimant" (R. 298).

In addition to the pre-October 1, 2004, radiological studies considered by the ALJ, he also evaluated the following clinical findings of record: 1) Dr. Just's August 13, 2002, finding that Plaintiff's straight leg raising rest was positive at 80 or 90 degrees, her deep tendon reflexes and

24

strength were normal, and "decreased sensation in S1 on the right foot" (R. 195, 298); 2) Dr. Just's January 1, 2003, finding that Plaintiff had lumbar range of motion pain, "no straight leg raising pain in the seated position, normal reflexes of the knees, normal left ankle reflex, no right ankle reflex, and normal strength"(R. 39, 298); and 3) Dr. Just's August 15, 2002, opinion that Plaintiff had "no straight leg raising pain in the seated position at 90 degrees on either side," normal hip examination, normal strength, normal reflexes in her knees, trace positive reflex in left ankle, no right ankle reflex, and could "take a few small steps on her toes and her heels indicating a general preservation of her strength" (R. 250, 298). The ALJ found these "clinical findings . . . [were] quite benign." The ALJ also found that the radiological studies and the clinical findings "contradict[ed] the claimant's subjective assessment of her functional capacities" (R. 298).

The ALJ also considered and evaluated Plaintiff's activities of daily living that were part of the record that pre-dated October 1, 2004. The ALJ considered Plaintiff's testimony at the December 10, 2003, hearing that she exercised at Curves three times weekly for one-half hour each time; she helped another individual clean her home; cooked at fifteen-minute intervals; shopped when necessary; "used the mails without assistance"; drove four or five times per week; socialized "at least three times per week by telephone or in person with family members or friends"; and could manage money without assistance (R. 36-72). The ALJ considered Plaintiff's October, 2002, statements that she could perform her personal ADL's without assistance; use tools and utensils; read novels; read newspapers occasionally; watch television; and tend her two dogs for three hours per day (R. 299).

Plaintiff further testified at the December 10, 2003, hearing that she experienced "'constant' severe back pain"; had short term memory loss; required a two-hour daily nap; lost the ability to walk; could not return to her dental assistant job because she "'couldn't do the amount of bending and

turning and getting up and down that was required of the job'"; had to lie on the couch due to fatigue; and could only sustain an activity for ten to fifteen minutes. The ALJ found these allegations were not consistent with the evidence of record (R. 298). He noted Plaintiff testified she could exercise for thirty minutes but cook for only fifteen minutes; she could "hardly walk" but she shopped; she experience pain on a scale of seven out of ten but that medication relieved her pain to some extent; she drove a car five times per week but experienced "disabling pain" when she moved; she experienced memory loss but read, watched television, drove, and managed her medication (R. 299).

In addition to her argument that the ALJ did not weigh any medical evidence prior to October 1, 2004, the date Plaintiff was found to be disabled, Plaintiff asserts that the ALJ "relied on . . . [Dr. Trumbull's] analysis . . . for the second application determination effective as of October 1, 2004. [Dr. Trumbull] concluded that the Plaintiff could only do sedentary work." Relative to the June 20, 2006, decision, "[a]t page 446, Dr. Trumbull lists the medical evidence he relied upon. All but two records came from before October 2004. . . . The ALJ does not even mention [Dr. Trumbull] in his June, 2006, decision . . ." (Plaintiff's brief at p. 3). Plaintiff's argument fails because the ALJ did consider the February 28, 2005, opinion of Dr. Trumbull in his June, 2006, decision and found the following:

> . . . [T]he opinion of Donald Trumbull, M.D., a Maine DDS reviewing physician, is rejected as to the degree of impairment suffered by the claimant. (Exhibit 14F). Implicitly, Dr. Trumbull relied upon new and material evidence: the claimant's assessment of her own condition as reported to the Maine DDS examining psychologist; and the opinion of the claimant's treating physician, to find the claimant limited to less than sedentary work. (Exhibits 11F, 12F, 14F). The claimant's assessment of her own medical condition is not a reliable basis upon which to establish a residual functional capacity. It contradicts the concession made by the claimant at the last hearing that she could perform sedentary work and in her written offer of proof that she could perform less than light work. Consequently, in the absence of consistent radiological findings and clinical observations, the opinion of the claimant's treating physician is not a reliable conclusion (R. 300).

Plaintiff asserts that the records on which Dr. Trumbull relied pre-dated the October 1, 2004, favorable decision (Plaintiff's brief at p.3). That is true, but those records were the records of Dr. Nabozny and Just and were, as noted above, considered and evaluated by the ALJ in the June, 2006, decision (R. 446, 297-300). Additionally, Dr. Trumbull relied on Dr. Nabozny's November 4, 2004, opinion that Plaintiff's pain "severely limit[ed] sit/stand ability to walk very far,'" and this opinion post-dates the October 1, 2004, favorable decision (R. 445).

Finally, the ALJ was not required to "call[] a medical expert to find an onset date that reflect[ed] the content of the medical records" as argued by Plaintiff. Plaintiff provides no case law, rule, or regulation to support this argument (Plaintiff's brief at pp. 3,4). The Appeals Council, in its remand order, did not require the ALJ to "obtain the testimony of a medical expert to address the issue of onset of disability prior to October 1, 2004"; the Appeals Council ruled the ALJ "may wish" to do so (R. 318). Based on the ALJ's review of the record in this case, he did not err in not obtaining the opinion of a medical expert as to Plaintiff's onset date.

The ALJ's consideration and evaluation of the record of evidence, and the decision issued based on same, is supported by substantial evidence.

### D. Remand Order

Plaintiff contends that the ALJ erred by not following the remand order to allow the claimant to testify at the May, 2006, administrative hearing. Defendant asserts the ALJ complied with the District Court's and the Appeals Council's remand orders. There is no merit to Plaintiff's argument.

The Appeals Council vacated the September 30, 2004, decision of the ALJ and remanded the case "for the period prior to October 1, 2004, . . . for further proceedings consistent with the order of the court." The Appeals Council instructed the ALJ to "comply with the court order and take the

actions set forth therein" (R. 318). The court order to which the Appeals Council referred was the order issued from the United States District Court for the District of Maine. In that decision, the magistrate judge found the ALJ made an "error in reading those reports" – "Exhibits 2E and 3E" – which caused the ALJ to conclude that Plaintiff's testimony as to her job description at a previous hearing "was not accurate because it was inconsistent with her written reports" (R. 307-08). Defendant is correct in his assertion that the ALJ's error was not his interpretation of Plaintiff's testimony at a former hearing but was his misreading the exhibits as to Plaintiff's past job duties, combination of duties, and performances of those duties as compared to her testimony. This misreading caused the remand by the District Court of Maine and Appeals Council; therefore, the ALJ was required to correct this misreading as to Plaintiff's past relevant work by relying on additional testimony of a vocational expert. The ALJ did that.

The ALJ, in making his September 30, 2004, decision, failed to notice an addendum Plaintiff had made to her October 2, 2002, Work History Report (R. 156-63). Plaintiff listed information about her work in Section 2 (R. 156). She then elaborated as to the duties and work performance for five jobs (See pp. 15-17 of this Report and Recommendation). There were addenda to jobs four and five. Relative to Plaintiff's fourth listed job, she named her title as dental assistant and wrote that she performed the job as she performed the job in descriptions two and three (R. 160). The addendum to this entry read that Plaintiff, in her dental assistant job for this particular dental group, worked as a dental assistant during the first six years and then as office manager the last three years. As office manager, she oversaw personnel "and in-house related tasks" (R. 163). Plaintiff's job five – that of office manager from September, 1994, to March, 1997 – required her to oversee the "dental assistants and front desk personel" [sic]; "handled customer support, in-house support and annual

28

hiring and performance reviews"; responsible for all ordering and maintaining of office supplies; moved boxes, carried, lifted, reached, walked for four hours, sat for four hours, wrote, typed, handled small objects, lifted ten pounds and frequently lifted less than ten pounds and supervised fourteen people. The addendum to this entry read that Plaintiff made salary recommendations, developed office procedures and policies, filled in as a dental assistant "if short staffed," and filled in as a front desk support worker "if short staffed" (R. 161, 163). The ALJ did not consider these addenda in the September 30, 2004, decision.

In the May 24, 2006, administrative hearing, the ALJ addressed the duties and job performances of Plaintiff as to her past relevant work in his questions to the VE. The following exchange occurred at that hearing:

ALJ: Claimant has past relevant work as a dental assistant and office manager. Is that correct? (R. 467).

VE: As well as combined. Yes. That's correct (R. 467).

ALJ: Were those jobs combined, or were they together? (R. 467).

VE: They were separate and combined and then separate (R. 467).

ALJ: When were they separate? (R. 467).

VE: Okay. Job panel number one, page one of 3E, dental assistant, dental office, 7/2001, to 12/2001. Job number four (R. 467).

ALJ: Wait. . . . Okay. . . . This is dental assistant? (R. 467).

VE: . . . Dental assistant period from 7/2001, to 12/2001. Also, dental assistant only listed as job number four from 3/88, to 9/94. And then there's an asterisk. It says, see remarks under job title number four description by the Claimant, and I don't find the asterisk elsewhere on the page. . . . I can't find them (R. 467-68).

Atty: I'll find them for you (R. 468).

29

VE:      . . . Then office manager is listed as that only by job title as job number five from 9/94, to 3/97, same dental office. So my conclusion is that the worked as a dental assistant and then as added other duties, which became jobs number two and three from, it looks like 9/2001, to 1/2001, as near as I can tell (R. 468).

CMT: 1/2002 (R. 468).

ALJ:     When did she . . . combine the . . . duties? (R. 468).

VE:      All right. The duties combined on, there's a little bit of disparity between the listing on page 1 and the job descriptions as they come along on pages 2, 3, and 4, . . . . [in] . . . Exhibit 3E. It looks like, and she says that she worked as a dental assistant from 7/2001, to 9/2001, then became front desk support in Dr. Porter's and Dr. Something in job number two in the DC office two days a week until the end of December, 2001. And then there's an asterisk. . . . So . . . my interpretation of that is she started as a dental assistant and . . . the front desk support stuff was added a little bit later. And then at a much later time she apparently went back to just being a dental assistant and then became . . . office manager. So I guess my interpretation of that ultimately is she's been an office manger, she's been a dental assistant, and then she's had a job that was, it is not listed in the DOT, which is a combination thereof (R. 468-69).

ALJ:     Let me clarify . . . what you just told me from March . . . of '88, through September of '94, she worked as a dental assistant. Is that correct? (R. 469).

VE:      That's what it says (R. 469).

ALJ:     And then from September of '94, to March of '97, she worked as an office manager. Is that correct? (R. 469).

VE:      That's what it says (R. 470).

ALJ:     And from July of 2001, through December of 2001, she worked as a dental assistant? (R. 470).

VE:      Right (R. 470).

ALJ:     But then in September of 2001, through December, 2001, there were added duties? (R. 470).

VE:      Right. In other words, the last part of that tenure, from 7 to 12/2001, became

a dual job (R. 470).

ALJ:   Now, Ms. Noyes, did you hear that testimony? (R. 470).

CMT:   Uh-huh (R. 470).

VE:    . . . [T]here's another, job three . . . from 8 of '98, to 1/2001, it was a combination job (R. 470).

Atty:  . . . [T]hat's an incomplete record he's reading from (R. 470).

VE:    That's all I have (R. 470).

Atty:  . . . [H]is record he testified from just now is incomplete, and it's the record that was the subject of the remand. If his testimony is to be accurate . . . he should have access to the complete record. And he's missing the parts in which she explains both those jobs and the part in which she says [she] also had to fill in as a dental assistant (R. 471). (Plaintiff's counsel provided pages 161 and 163 of the Administrative Record to the VE (R. 472)).

VE:    Okay. I've read it (R. 473).

ALJ:   Do you have an opinion whether, when, if at all, there were added job duties or the job duties were combined? (R. 473).

VE:    . . . [I]n job number five, which is listed as office manager . . ., on number 156, 3E, she describes this as filled in as a dental assistant or at the front desk if short-staffed. This is in addition to being an office manager. So she kind of did three jobs. She did receptionist work, she did dental assistant when they were short-handed, . . . but her basic responsibility was that of office manager. And . . . it was not what is . . . considered an office manager, one who handles all billing and insurance. That's job number four, which is listed as dental assistant period. Office manager was in there, and it was crossed off, but this description might clarify everything. "I worked for a group dental practice for nine years. The first six years as an assistant in the Maryland office, the last three years in the Washington, D.C. office as office manager. The office manager position was one of overseeing personnel and in-house related tasks. It was not what is now considered as an office manager i.e., . . . 'one who handles all billing and insurance.'" . . . [S]he was, at one point . . . a dental assistant and at one point . . . an office manager (R. 473-74).

ALJ:   When was she a dental assistant solely? (R. 474).

31

VE:     . . . I would feel comfortable with saying solely from 7/2001, to 12/2001, according to the listing. Here's what happens. The job titles versus the job descriptions are not in sync. If she lists dental assistant from 7 to 12/2001, so then you look at . . . what she did as a dental assistant, job title number one, dental assistant, front desk support. So with, what did you do all day? "I worked as a dental assistant from 7/2001, to 9/2001, then became front desk support two days a week until the end of December, 2001" (R. 474).

ALJ:    Did she ever simply work as a manager, dental office manager? (R. 474).

VE:     Well, it looks like she worked only as a manager the last three years in the Washington, DC, office (R. 475).

ALJ:    (To Claimant) Did you ever solely work as a dental office manager or as solely as a dental assistant? (R. 476).

CMT:    No. I worked solely as a dental assistant, but I never worked solely as an office manger. . . . I worked solely as a dental assistant in Group Dental in Maryland, and then when I went to the DC office I worked as a combination office manager, dental assistant, front desk assistant, I . . . did everything. And then at the end of 97, I guess it is, I left that job altogether (R. 476).

ALJ:    Let me just ask the VE, now, as a dental assistant is that DOT code 079-361-018? (R. 476).

VE:     Right. Light duty, SVP 6 (R. 476).

VE:     (To ALJ) [Y]ou wanted the physical demands of the job, dental assistant. Light duty. . . . Occasional stooping, frequent reaching, frequent handling, frequent fingering, occasional feeling, occasional talking, frequent hearing, and frequent narriquity [phonetic], occasional depth perception, occasional accommodation visually, and occasional culivision [phonetic] (R. 477).

ALJ:    Based on the past relevant work experience of this particular Claimant, would that . . . hypothetical Claimant be capable of occasionally lifting 20 pounds, frequently lifting ten pounds, standing or walking about six hours in an eight hour day, sitting with normal breaks for about six hours in an eight-hour day, with an occasionally limitation in climbing ramps or stairs, marked inability to climb ladders, ropes, or scaffolds, and occasional limitation, which means they would be frequently capable of balancing, stooping, kneeling, crouching, crawling. . . . And . . . this individual must avoid concentrated exposure to hazards such as machinery and heights, uneven ground. Would they be able to do the job of . . . dental assistant? (R. 477).

VE:      Yes (R. 478).

ALJ:     (To Attorney) And your argument . . . just for the record? (R. 478).

Atty:    I stated it and filled it out that she did not work independently as a dental assistant.  She worked in a job that was a combination of jobs, and that's what the Court so found (R. 478).

VE:      Oh, 163 (R. 479).

Atty:    Under number five, which is office manager, she says, "I also filled in as dental assistant."  . . . [Y]ou can see from this, even on number five, she didn't mean to say she just was an office manager.  I think you can read that and see that (R. 469).

VE:      Oh, I can read it (R. 479). . . . But I differ with your opinion in this sense. She . . . wrote . . . "The office manger position was one of overseeing personnel and in-house related tasks." . . . That is not outside of the usual and customary office manager (R. 480).

Atty:    I don't dispute that, but I'm just saying these are the same jobs . . . she's describing (R. 480).

VE:      But she says . . . "It was not what is now considered an office manager: one who handles all billing and insurance." . . . So in a sense she did a little bit less than some office managers might do in terms of her perspective. . . . What I don't see here is I did dental assistant at the same time.  That's what I don't see.  I see I was an office manger during the last three years in Washington, DC, office (R. 480).

Atty:    But as part of that she did . . . fill in as a dental assistant (R. 481).

VE:      It doesn't say that here (R. 481).

Atty:    Yes, it does say that there. . . .  And now read number five out loud  . . . [a]nd maybe this will answer the question (R. 481).

VE:      Oh, oh.  They're out of sequence here. . . .  All right.  "And with the chief of staff made salary recommendations and developed office procedures and policies.  I also filled in as a dental assistant or at the front desk if short-staffed."  So that makes it perhaps an incidental fill-in, and it wasn't . . . a usual and customary duties of her job (R. 481).

Atty:   But doing it nonetheless (R. 481). . . .  And I think she testified that she'd do
        that once or twice a week, to fill in (R. 482).

Atty:   So let me ask, if I may, again, is there any incidence in here now of her doing
        exclusively the job of an office manager? (R. 482).

ALJ:    As either generally performed or specifically performed? (R. 482).

Atty:   Well, specifically, Your Honor (R. 482).

VE:     My interpretation of this whole thing is that she demonstrates appropriate and
        timely and adequate in terms of SVP performance of both occupations at the
        same time from time to time . . . (R. 482).

Atty:   That's fine.  That's fine (R. 482).

VE:     And from time to time only one or only the other.  And I think it looks like
        . . . she started as a dental assistant and then things were added, and then as
        a result of those things being added, she was elevated.  But in her elevation
        at some point along the continuum of office manager . . . she had to fill in as
        dental assistant and or front office, which does not entirely abort the fact or
        abort that she can do or erode her capability of performing all of them.  So
        you got, she can be a front office support person as far as I'm concerned, she
        can be an office manager, albeit she didn't do billing and insurance. . . .  She
        could be a dental assistant (R. 482-83).

ALJ:    Why wouldn't based upon that hypothetical . . . 20207 . . . dictate? (R. 483).

Atty:   Well, first . . . of all, there's no testimony that the skilled [sic] are transferable
        . . . (R. 483).

ALJ:    (To VE) Does she have transferable skills? (R. 483).

VE:     Yes (R. 483).

ALJ:    She has . . . transferable skills. . . .  She's advanced age, she has a high school
        graduate or more (R. 484).

Atty:   Yes and yes (R. 484).

ALJ:    Okay.  Skills transferable, not disabled.  Why wouldn't that apply? (R. 484).

Atty:   First of all, her testimony with regard to what she had to lift, carry, and

34

unload supplies has been completely ignored here this morning. That hasn't even come out yet, and I'm going to put it on here (R. 484).

ALJ:    No, no (R. 484).

Atty:    . . . I would even query whether she's capable of . . . solely light work. She has written here in a number of different places she was responsible for unloading supplies, . . . boxes full of paper towels . . . . She will testify to all of this, so . . . I will be putting her on to give that testimony. . . . She was carrying cases of dental tools, she would carry in hazardous materials such as mercury amalgam. She was responsible for working with blood and with other contaminated materials. She had to clean the operatory rooms when they were finished. So by no means clear at least at this point in this hearing that she was doing just light work. Secondly of all, with respect to the skills, she does have skills, but whether or not they're transferable to a field outside of dentistry or medical is another issue. I would argue they were gained in an isolated vocational setting and are not transferable. The arguments that I just raised were in her initial application. . . . [T]hey've been on the record since the beginning, that she had to lift and carry. They were in the hearing that you did . . . on December 10 of 2003. They're not new. She had testified the first time that she had to carry things, lift, unload supplies, and they're in here. There's nothing new about those . . . (R. 484-85).

ALJ:    So I'm asking you . . . if I rely upon Exhibit 8F, . . . which essentially finds light work with some postural limitations and a couple minor environmental limitations, and I apply her age and education and her previous work experience, you don't think that that 20207 applies? (R. 485-86).

Atty:    No. The testimony that you elicited from Cynthia Flint Ferguson in the first hearing shows that the job as she performed it, both dental assistant and slash office manager, job duties were different than that required generally. And that was pretty clear, because she did testify the first time about lifting and carrying and unloading supplies . . . (R. 486).

ALJ:    (To VE) [D]oes this Claimant possess any transferable skills in her combined job as a dental assistant/office manager to the position of dental assistant or office manager? (R. 486).

VE:    Yes, she does, but we have to include . . . the advanced age in terms of any erosion where she would have to transfer to a new job that would require her to do things that would be outside of her capability (R. 486-87).

ALJ:    And what are they? (R. 487).

35

VE:     Directing, controlling, or planning activities of others, performing a variety of duties, making judgments and decisions, and dealing with people (R. 487).

ALJ:    Now, assuming the hypothetical that I gave you earlier . . . which is the exertional limitations for light work with the frequent ability to climb, excluding ladders, ropes, and scaffolds. . . . Balance, stoop, kneel, crouch, or crawl and must avoid concentrated exposure to hazards including machinery and heights, and must avoid uneven floors. Is there anything in the record, in the vocational record that would preclude the Claimant from performing the job of dental assistant or office manager? (R. 487).

VE:     No, Your Honor. I have no information . . . about all this heavy lifting and amalgam, mercury amalgam, handling, and so forth. Although a dental assistant may do that. . . . Generally a dental assistant assists the dentist as opposed to a dental hygienist, who prophylaxis and x-rays and so forth and so on. Two different jobs (R. 488).

ALJ:    (To Attorney) Tell me . . . what her residual functional capacity is? (R. 489).

VE:     For me to tell you? I think it's less than light, and I think her job requirements are greater than light (R. 489).

ALJ:    Okay. So she has a sedentary RFC. Correct? (R. 489).

Atty:   Correct (R. 489).

As noted by the above exchange, the ALJ, through the testimony of the VE, was made aware of the job duties and work performances of Plaintiff's past relevant work. He considered all sections of Exhibit 3E, including the addenda to Section 4 and Section 5, which clarified Plaintiff's combined work duties. The ALJ found Plaintiff was capable of performing her past relevant work as a dental assistant, which was light, and dental office manger, which was sedentary.

In his June 20, 2006, decision, the ALJ found the following:

In comparing the claimant' residual functional capacity with the physical and mental demands of this work, the claimant is able to perform the two positions as *generally* performed (emphasis added).

The claimant testified she performed these positions as one combined position.

(Court transcript p. 55).

The claimant argued at the supplemental hearing on March 25, 2004, that an Administrative Law Judge could only consider whether the claimant retained the residual functional capacity to return to her combined job as a dental office manager/dental assistant and could not lawfully consider whether the claimant retained the residual functional capacity to perform the separate jobs of dental assistant or dental office manager as each was generally performed in the national economy. (Court transcript p. 77).

Further, the claimant argued at the May 24, 2006, hearing that the claimant had a sedentary residual functional capacity but that this sedentary work capacity was not material to the issue whether the claimant could perform the job of dental office manager as generally performed.

While evaluation of the claimant's past relevant work as actually performed based on the less physically demanding of the two jobs would be inconsistent with the Social Security Act, the skills the claimant retained from these jobs are material to her claim of disability: when the demands of [a] particular job which the claimant performed . . . cannot be met, if the claimant has the capacity to meet the functional demands of that occupation as customarily required in the national economy, then a finding of non-disability also follows. (S.S.R. §§82-61, 82-62).

The vocational witness testified in the first hearing that the job of dental assistant requires only occasional stooping, defined as up to one third of the work-day, and that the postural limitations of no climbing, no uneven surfaces and balancing, kneeling, crouching, or crawling are inconsequential in the ability to perform the position of office manager. (Court transcript pp. 21, 22, 57). The first vocational witness similarly testified the claimant performed "all of the duties of an officer manager." (Court transcript p. 60). Further, the first vocational witness testified the claimant performed her combined job consistent with the job duties of dental office manager: "She was in charge of overseeing and supervising dental assistants and front desk personnel. She handled customer support issues, in-house support, hiring and performance reviews, that's the crux of the job. Doing payroll, communicating with insurance companies are separate positions and are specialities as defined by the DOT." (Court transcript p. 61).

This testimony is generally consistent with the testimony of a second vocational witness at the third hearing, who asserted the claimant retained transferable skills from her combined position to the position of dental office manager or dental assistant (R. 301).

The ALJ thoroughly considered the evidence as to Plaintiff's past relevant work. He

adequately developed the record as to Plaintiff's performance as a dental assistant and/or dental office manager and he assessed her performance of her duties with the duties of those two types of work as generally performed in the national workforce. S.S.R. 82-61 mandates the following:

> 3. Whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy. (The Dictionary of Occupational Titles (DOT) descriptions can be relied upon--for jobs that are listed in the DOT -- to define the job as it is usually performed in the national economy.) It is understood that some individual jobs may require somewhat more or less exertion than the DOT description.
>
> A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

The ALJ complied with S.S.R. 82-61; he clearly made a finding as to Plaintiff's being able to perform the jobs of dental assistant and/or office manager as those jobs are performed generally in the national economy. Also, as noted in the lengthy and specific question/answer dialogue that occurred at the May 24, 2006, administrative hearing, the ALJ was careful to correct his misreading of Exhibit 3E. The ALJ considered the past testimony of Plaintiff as to her job duties and considered that testimony in connection to the written evidence of record. The ALJ considered and evaluated the opinion of the vocational experts who testified at two of the administrative hearings in this matter. The above referenced hearing dialogue and relevant portion of the ALJ's June 20, 2006, opinion demonstrate that the ALJ complied with the remand orders of the Appeals Council and the District Court of Maine to develop the record as to Plaintiff's past relevant work. His decision as to Plaintiff's past relevant work is supported by substantial evidence.

Even though the undersigned has determined above that the ALJ was not mandated, in the remand order, to permit the Plaintiff to testify, as asserted by Plaintiff in her brief at page 4, the undersigned notes the ALJ did address Plaintiff's testimony as follows:

> The claimant sought to testify at the third hearing as to the requirements of her combined position. This testimony was not permitted where it was 1) cumulative of the claimant's earlier testimony and the testimony of two vocational witnesses, and 2) the decision turns not on whether her residual functional capacity permitted her to perform the job as actually performed but rather whether she possessed transferable skills in conjunction with her residual functional capacity to perform the two jobs as generally performed in the national economy.

> Approximately two weeks following the hearing, the claimant filed a written offer of proof as to this proposed testimony. (Exhibit 11E). The proposed testimony in the offer of proof is cumulative of the earlier testimony. The claimant also noted in her offer of proof a statement that her residual functional capacity was ". . . less that light, affected by some postural limitations, the need for naps during the day." This proposed testimony is cumulative of her earlier testimony. The remainder of the offer of proof is argument previously considered and rejected. This offer of proof does not merit rehearing of any contested issue (R. 301-02).

Although the ALJ was not required to hear Plaintiff's testimony at the May 24, 2006, hearing, he considered her Offer of Proof, which was submitted to the ALJ after the hearing. As noted above the ALJ considered and evaluated Plaintiff's previous testimony in his June 20, 2006, decision. Substantial evidence supports the decision of the ALJ to not allow Plaintiff to testify at the third administrative hearing.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED**, and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 28 day of July_____, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE